**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

LAURA ROGERS-MARTIN,                                          Case No. 1:13-cv-544

                        Plaintiff,                                          Beckwith, J.
    v.                                                                      Bowman, M.J.

COMMISSIONER OF SOCIAL SECURITY,

                        Defendant.

## REPORT AND RECOMMENDATION

Plaintiff Laura Rogers-Martin filed this Social Security appeal in order to challenge the Defendant's finding that she is not disabled. *See* 42 U.S.C. §405(g). Proceeding through counsel, Plaintiff presents two claims of error for this Court's review. As explained below, I conclude that the ALJ's finding of non-disability should be AFFIRMED, because it is supported by substantial evidence in the administrative record.

### I.  Summary of Administrative Record

Plaintiff first filed an application for disability insurance benefits on April 15, 2003, alleging disability beginning the same date. That application was denied initially, on reconsideration, and ultimately, in a written decision by Administrative Law Judge ("ALJ") Melvin A, Padilla following an evidentiary hearing. (Tr. 141-154).[1] Plaintiff did not appeal that decision; therefore, the determination that Plaintiff was not disabled up

---

[1]Throughout her Statement of Errors, Plaintiff cites to the record by "PageID" rather than to the page of the Administrative Transcript. While the undersigned appreciates that counsel intended to provide accurate citations to the record, citation to Page ID is strongly disfavored in social security cases at this time. In keeping with the current practice of this Court, the undersigned has cited to the transcript of the administrative record.

through June 21, 2006 remains binding on this Court.

On June 24, 2006, Plaintiff filed a new application for Disability Insurance Benefits ("DIB"), alleging a new disability onset date of June 22, 2006,[2] based upon a combination of physical and mental impairments. Plaintiff also filed an application for supplemental security income ("SSI"). Plaintiff's applications were again denied initially and upon reconsideration.

Represented by new counsel, Plaintiff timely requested an evidentiary hearing. On October 29, 2009, a new ALJ, Thomas R. McNichols II, presided over a hearing, at which Plaintiff appeared and gave testimony, along with a vocational expert. On December 14, 2009, ALJ McNichols issued a decision that concluded that Plaintiff was not disabled. (Tr. 170-181). Plaintiff successfully sought review from the Appeals Council, which remanded to the ALJ on March 14, 2011 on grounds that the ALJ's decision failed to discuss the opinions of Plaintiff's treating physician, Dr. Marvet K. Saleh. The Appeals Council directed the ALJ on remand to give consideration to the opinions of Dr. Saleh, to give further consideration to Plaintiff's residual functional capacity consistent with all evidence of record and applicable regulations, and if warranted, to obtain supplemental evidence from a vocational expert. (Tr. 189-190).

In response to remand from the Appeals Council, the ALJ held another evidentiary hearing on December 21, 2011, at which Plaintiff and a vocational expert both testified, along with Plaintiff's twenty-one year old daughter. (Tr. 81-138). On March 6, 2012, ALJ McNichols issued a partially unfavorable decision. The ALJ determined that Plaintiff became disabled on April 29, 2011, but that she was not

_____

[2]The prior unfavorable decision was dated June 21, 2006. Therefore, June 22, 2006 reflects the earliest onset date that Plaintiff could allege in a new application.

disabled prior to that date. Unfortunately for Plaintiff, her insured status for purposes of DIB expired on June 30, 2008. In order to gain DIB benefits, she was required to prove she became disabled prior to June 30, 2008; therefore, the disability finding entitled her only to SSI benefits. Plaintiff again sought review from the Appeals Council, but review of the 2012 decision was denied, and that decision remains as the final decision of the Commissioner. Plaintiff filed the instant complaint in order to challenge the ALJ's 2012 decision. Plaintiff argues that she became disabled on June 22, 2006, well before her insured status expired.

Plaintiff was 47 years old and in the "younger individual" age category at the time of the ALJ's last decision. She graduated from high school, and had some past work as a bailing machine operator, plastic injection mold machine tender, and other similar work ranging from the light to heavy exertional levels, most of which was unskilled. There is no dispute that Plaintiff has not worked since 2003, more than three years prior to her alleged disability onset date. There is also no dispute that she can no longer perform any of her past work.

Plaintiff alleges that she is disabled due to back, neck and shoulder pain, uncontrolled myoclonic jerking movements in her legs, hips, and torso, and severe psychological symptoms including anxiety and depression. The ALJ agreed with Plaintiff concerning her list of "severe" impairments, finding that she suffers from: chronic low back pain, intermittent myoclonic jerking, cervical spine and right shoulder arthralgias, depression and anxiety." (Tr. 20). However, none of those impairments or combination thereof met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 21).

The ALJ concluded that, prior to April 29, 2011, Plaintiff retained the residual

functional capacity ("RFC") to perform a restricted range of sedentary work, as further limited to:

> occasional climbing of stairs; no climbing ropes, ladders, or scaffolds; no balancing; occasional stooping and crouching; no kneeling and crawling; no exposure to hazards; stand and/or walk no more than four hours per eight hour day; no work above shoulder level on the right; no repetitive use of foot controls; low stress jobs requiring no production quotas and no fast paced work; simple, one- or two- step tasks requiring little, if any, concentration; and no exposure to vibrations.

(Tr. 22). The ALJ discounted many of Plaintiff's subjective complaints prior to April 29, 2011 as "inconsistent with the record as a whole and not entirely credible." (Tr. 23).

Only as of April 29, 2011 did the ALJ determine that Plaintiff's RFC was diminished to the point that she could no longer work. (Tr. 28). At that point in time, in addition to the limitations previously stated, the ALJ restricted Plaintiff to "no direct dealing with the general public." (Tr. 26). The ALJ relied upon new evidence to support his conclusion that Plaintiff's symptoms had increased, and her overall functional ability had declined. After hearing testimony from a vocational expert, the ALJ determined that Plaintiff became unable to work on April 29, 2011, but that her RFC afforded her the ability to perform jobs that existed in significant numbers in the national economy prior to that date, including the representative jobs of automatic grinding machine operator, dowel inspector, and charge account clerk (Tr. 26-27).

In her Statement of Errors, Plaintiff argues that substantial evidence does not support the ALJ's decision that she was able to work prior to April 2011. She asserts that the ALJ erred when he: (1) rejected the opinion of her treating physician, and (2) rejected the opinion of a her treating psychologist.

## II. Analysis

### A. Judicial Standard of Review

To be eligible for benefits, a claimant must be under a "disability." *See* 42 U.S.C. §1382c(a). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted). In conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). As the Sixth Circuit has explained:

The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion . . . . The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm. *Id.* (citations omitted).

In considering an application for supplemental security income or for disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Commissioner of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

A plaintiff bears the ultimate burden to prove by sufficient evidence that she is entitled to disability or supplemental security income benefits. *See* 20 C.F.R. § 404.1512(a). A claimant seeking benefits must present sufficient evidence to show that, during the relevant time period, she suffered an impairment, or combination of impairments, expected to last at least twelve months, that left her unable to perform any job. 42 U.S.C. § 423(d)(1)(A).

### B. Specific Errors

Plaintiff's two assertions of error focus on the ALJ's alleged failure to comply with the "treating physician rule." In evaluating the opinions of treating physicians, the relevant regulation provides: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the

other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. §404.1527(c)(2); *see also Warner v. Com'r of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir. 2004). The reasoning behind the treating physician rule has been stated as follows:

> [T]hese sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of the claimant's medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

*Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004)(quoting former 20 C.F.R. § 404.1527(d)(2)). Thus, the treating physician rule requires the ALJ to generally give "greater deference to the opinions of treating physicians than to the opinions of non-treating physicians." *See Blakley v. Com'r of Social Security*, 581 F.3d 399, 406 (6th Cir. 2009). In addition, the opinions of examining consultants are generally entitled to greater weight than are the opinions of non-examining consultants. *See Gayheart v. Com'r of Soc. Sec.*, 710 F.3d 365, 375-376 (6th Cir. 2013).

Despite the presumptive weight given to the opinions of a treating physician, if those opinions are not "well-supported" or are inconsistent with other substantial evidence, then the opinions need not be given controlling weight. Soc. Sec. Ruling 96-2p, 1996 WL 374188, at *2 (July 2, 1996). However, an ALJ must give "good reasons" for rejecting the opinion of a treating physician. *Id.*; *see also* 20 C.F.R. §404.1527(c)(2)("We will always give good reasons…for the weight we give your treating source's opinion."). In cases in which the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must consider additional factors to determine how much weight should be afforded to the opinion. The same factors are reviewed in evaluating all other medical source opinions, and include: "the length of the treatment relationship and the frequency of examination, the nature and

extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley*, 581 F.3d at 406. Plaintiff's argument boils down to whether or not the reasons provided for the ALJ's rejection of the referenced opinions were sufficient, and correspondingly, whether substantial evidence supports the ALJ's non-disability determination for the time period prior to April 29, 2011.

### 1. Failure to Accept Opinions of Dr. Saleh

Plaintiff first argues that the ALJ erred in rejecting some of the opinions of her treating pain specialist, Dr. Mervet Saleh.[3] Dr. Saleh has treated Plaintiff since May of 2002 through the Bureau of Worker's Compensation for a February 16, 1999 work-related injury. (Tr. 595). On April 18, 2006 and again on July 31, 2006, as well as on earlier dates in 2003 and 2004,[4] Dr. Saleh opined that Plaintiff was totally disabled. (*See* Tr. 595, 588-589). She stated that Plaintiff could not lift/carry more than five to ten pounds, stand/walk for more than ten minutes at a time without changing positions, could not climb, kneel, crawl, twist, bend, or reach above her head. She further opined that Plaintiff's prognosis was "poor and unstable" and that her disability was a "direct and proximate result from…her work related injury of 02-15-1999." (Tr. 588-589). Dr. Saleh's July 2006 letter refers back to her April 18, 2005 letter, "I have responded to that [counsel's March 2, 2006] request on a previous date with no response." (Tr. 740).

---

[3] Both the ALJ and the parties use a male pronoun to refer to Dr. Saleh in this proceeding. However, other evidence, including the 2006 ALJ's opinion and Plaintiff's testimony, indicates that Dr. Saleh is female; therefore, the undersigned has used the female pronoun to refer to Dr. Saleh.

[4] Dr. Saleh submitted similar functional capacity assessments and disability opinions in 2003 and 2004, in which she opined that Plaintiff was totally disabled from all work activity. Those opinions were given "minimal" weight in the 2006 decision, because they were not well-supported with information concerning Plaintiff's spinal range of motion and strength, were inconsistent with Plaintiff's daily activities, and were unsupported by treatment notes, which reflected conservative care and did not contain objective findings reflecting neurological involvement of any kind. (Tr. 149). Although Dr. Saleh's 2003 and 2004 opinions are no longer at issue, they provide additional context.

In February 2008, Dr. Saleh offered new opinions, again concluding that Plaintiff was disabled, but this time restricting Plaintiff to lifting 2-5 pounds occasionally and ½ to 2 pounds frequently. Dr. Salah also opined in 2008 that Plaintiff was precluded from standing, walking, or sitting for more than 30 minutes in an eight-hour day, and that she would be absent from work more than three times per month. (Tr. 753-765).

In October 2011, Dr. Saleh completed one more set of interrogatories. (Tr. 963-970). At that time, she again opined that Plaintiff was disabled due to her physical and psychological symptoms. (*Id.*).

The ALJ rejected Dr. Saleh's 2006 and 2008 opinions as "inconsistent with the record as a whole and…not supported with objective medical findings." (Tr. 25). The ALJ eventually at least partly agreed with Dr. Saleh's last opinion, to the extent that the ALJ found Plaintiff to be disabled in April 2011. However, with respect to the earlier 2006 and 2008 opinions, and even with respect to Dr. Saleh's 2011 opinions, the ALJ noted inconsistencies with the record, including with Plaintiff's own testimony:

> As will be discussed below, at the time of the hearing, [Plaintiff] has been found to be disabled. However, even at this time, she testified that she can lift 10 pounds, stand up to 20 minutes at a time, and walk up to two blocks. She is able to perform extensive activities of daily living. In addition, such limitations are not support[ed] by the above discussed conclusions that her pain is only intermittent and that she needs more exercise and less sedentary time.

(*Id.*). The ALJ noted that Plaintiff's physical impairments "have been treated only with conservative care," and she has "no side effects from medication." (*Id.*).

As Defendant points out, Plaintiff does not dispute the ALJ's conclusion that Dr. Saleh failed to cite to any specific objective findings to support her disability opinions back in 2006 or 2008. Although Plaintiff points out that Dr. Saleh cited to specific medical evidence including MRIs in one of her opinions, those references were not

provided until 2011, and were not included in the earlier opinions. By contrast, in her July 2006 opinion, Dr. Saleh opined more generally that Plaintiff:

> is unable to return to or obtain gainful or sustained employment. This is based on his [sic] marked impaired mental and hysical [sic] functional capabilities, she is in a severely deconditioned state and the physical deficits/findings upon her monthly evaluations.

(Tr. 741). Even though the July 2006 opinion was provided a few weeks after Plaintiff's alleged disability onset date of June 22, 2006, it refers back to Dr. Saleh's April 2006 opinion (prior to her disability onset date), and strongly implies that Dr. Saleh believes that Plaintiff has remained in the same "disabled" state for years: "It is my professional and medial [sic] opinion …that [Plaintiff] is permanently and totally disabled…as a direct and proximate result from the impairments from her allowed conditions from her work-related injury of 02-16-1999." (*Id.*). The April 18, 2006 letter similarly stated that Plaintiff was "unable to perform any sustained remunerative employment due to her pain problems related to the BWC injury of on date 2-16-99." (Tr. 595). Both 2006 letters echo Dr. Saleh's 2003 and 2004 opinions that Plaintiff was completely disabled. In her reply, Plaintiff specifically points to clinical records dated November 28, 2005, February 16, 2006, and June 19, 2006 that she argues support Dr. Saleh's 2006 opinions. However, all of those records *precede* Plaintiff's June 22, 2006 disability onset date. The June 21, 2006 non-disability determination cannot be challenged as it is *res judicata* for purposes of this proceeding.

Plaintiff also points to a handful of exams by Dr. Saleh that occurred between her 2006 and 2008 opinions, wherein she notes a list of physical symptoms including myoclonic jerking. (*see* Tr. 573). However, that particular symptom appears to have been much more severe in the pre-June 2006 records on which Plaintiff chiefly relies –

records that were not cited by Dr. Saleh.[5]  Moreover, in the same post-July 2006 clinical records, Dr. Saleh makes notes like, "We did discuss exercising and staying active without overdoing," which appear at odds with the opinion that Plaintiff is totally disabled.  (*See, e.g.*, Tr. 573, 578, 580, 581).   In her 2008 opinion, Dr. Saleh fails to cite to *any* objective findings to support her statement that Plaintiff was "in a severely deconditioned state…." (Tr. 741).

Just as she does not seriously dispute the lack of objective citation or support for Dr. Saleh's 2006 and 2008 opinions, Plaintiff offers no challenge to the ALJ's observation that Dr. Saleh's extreme conclusions were inconsistent even with Plaintiff's own testimony.  For example, in 2008 Dr. Saleh restricted Plaintiff to 2-5 pounds only occasionally, with standing/walking or sitting not more than 30 minutes *total* in an entire 8-hour period.  However, Plaintiff herself testified that she could lift 10 pounds, could stand for 20 minutes *at a time* (without reference to restrictions in an 8-hour period), and could walk two blocks. (Tr. 104, 743). Dr. Saleh's opinions also are riddled with internal inconsistencies.   For example, despite limiting Plaintiff to such severe postural restrictions that Plaintiff would be precluded from any position but lying down, in the same form Dr. Saleh opines that Plaintiff actually retains "the residual functional ability" to perform "sedentary work" on a "sustained basis (in an eight hour work day)." (Tr. 745-746).  Incongruously, in her later 2011 opinions, Dr. Saleh opined that Plaintiff had regained the ability to sit "without interruption" for 5 hours.  (Tr. 967).  Yet, inexplicably, Dr. Saleh stated in the same document that Plaintiff was only able to sit for 3 hours "total" in an eight hour day.  (*Id.*).

Given the inconsistencies as noted and lack of support for Dr. Saleh's 2006 and

---

[5]*See, e.g.,* Plaintiff's citation to a March 2006 record by neurosurgeon Dr. Minella. (Tr. 463).

2008 opinions,[6] the undersigned finds substantial evidence supports the rejection of those two opinions by the ALJ. Nevertheless, Plaintiff disputes the ALJ's conclusion that Dr. Saleh's opinions were not supported by the record as a whole. For the first time in her reply memorandum, Plaintiff briefly argues that the ALJ found "three more severe physical impairments" between his 2009 and 2012 decisions, including the addition of intermittent myoclonic jerking, and cervical spine and right shoulder arthralgias. She asserts that the mere addition of severe impairments should have resulted in a finding of disability. However, the addition of a diagnosis says nothing about its severity. Moreover, Plaintiff's myoclonic jerking was discussed in some detail even in the ALJ's superseded 2009 opinion, and the Plaintiff offers no argument or evidence to suggest that the cervical and/or right shoulder arthraligias were not adequately addressed by the RFC as determined by the ALJ.

Plaintiff focuses most of her argument on the allegedly disabling effect of her myoclonic jerking movements, on which she suggests Dr. Saleh's opinions were based. But, while the 2011 opinions may have been partly based on that symptom, Dr. Saleh's 2006 and 2008 opinions clearly focused on Plaintiff's back issues and did not even mention Plaintiff's myoclonic jerking. (Tr. 740-752).

In any event, most of the records on which Plaintiff relies pre-date her alleged disability onset date of June 22, 2006. Only a few – primarily relating to a September 2006 psychiatric hospitalization - post-date her alleged disability onset date. Plaintiff fails to point to any evidence that her jerking movements, either by themselves or in

_____

[6]Dr. Saleh's 2011 opinion –which bears a signature stamp rather than an original signature and refers to Dr. Saleh in the third person – also contains inconsistencies. For example, she opines that Plaintiff's reaching, handling, fingering, and pushing/pulling abilities are not "affected" by her cervical/shoulder impairments (Tr. 968). In a separate section of the same form, Dr. Saleh contradictorily states that Plaintiff's "lower extremity pain" "prevents reaching pushing and pulling." (Id.).

combination with other symptoms, worsened beginning on June 22, 2006. Rather, the records reflect that her condition has been longstanding (since before the June 21, 2006 decision), waxes and wanes, increases with psychological stress, does not appear to impact muscle tone or strength, and primarily affects her legs. (*See e.g.*, Tr. 482). A consulting neurologist during her September 2006 hospitalization suggested a diagnosis of a "movement disorder" without further specificity. (*Id.*).

As corroborative evidence that her jerking was so severe as to be disabling beginning on June 22, 2006, Plaintiff relies heavily on the records of Dr. Payne, Plaintiff's psychologist, that make note of Plaintiff's "painful" tremors. However, the vast majority of Dr. Payne's records are from 2004 and 2005. Only one of Dr. Payne's records post-dates Plaintiff's disability onset date, but that record, in September 2006, was close to her psychiatric hospitalization, a time during which short-term psychological stress was increasing her symptoms. (Tr. 683, 09/22/06 notation that "tremoring is terrible").

As additional evidence that Dr. Saleh's 2006 and 2008 disability opinions were "consistent with the record as a whole," Plaintiff cites the November 14, 2006 opinion of a consulting examining physician, Dr. Danopulos, that Plaintiff's myoclonic jerking affected her "substantially and definitively," and "abolished" any ability to work because of the severity and frequency of the movements. (Tr. 557). It bears repeating that unlike Dr. Danopulos's opinion, Dr. Saleh's 2006 and 2008 opinions do not relate to Plaintiff's jerking, but instead to symptoms from her 1999 back injury. In addition, in contrast to the opinions of Dr. Danopulos, a non-examining consultant, Dr. Walter Holbrook, reviewed the entirety of Plaintiff's records and determined on December 4, 2006 that Plaintiff's myoclonic jerking was not disabling. (Tr. 562-569). Dr. Holbrook

cited in part the RFC previously determined in June of 2006, which considered the jerking, and the binding nature of that RFC absent evidence of deterioration.  *See* Acquiesance Ruling ("AR") 98-4(6); *Drummond v. Com'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997).

While the ALJ did not fully adopt Dr. Holbrook's RFC, insofar as he found Plaintiff no longer remained capable of "light" work but was restricted to a limited range of "sedentary" work between June 22, 2006 and April 29, 2011, the ALJ did agree with Dr. Holbrook that "there was no evidence then, or since, that myoclonic jerkings of unknown etiology are disabling."  The ALJ reasoned that the jerking movements were accommodated by his RFC, relying in part on Dr. Danopulos's physical findings, which documented no atrophy, normal muscle strength, and no sensory deficits.  (Tr. 23, citing Tr. 556).  Undermining her claim that her jerking became significantly more severe in June 2006, Plaintiff concedes that the records reflect that her myoclonic leg jerks ceased entirely after she had nerve root blocks in January and February 2008.  (Tr. 823).  However, she points out that by April 7, 2008, Dr. Saleh documented that "light twitching" had returned in one of her legs.  (Tr. 819).  By July 2008, Dr. Saleh recorded "mild jerking" of the same leg, and on November 2009, Plaintiff reported "increased" involuntary leg movements.  (Tr. 1048).  This handful of notes reflecting a cessation and recurrence of her jerking symptoms do not indicate that the condition disabled her between June 22, 2006 and April 29, 2011.

Plaintiff argues that the ALJ committed legal error by suggesting he was declining to find disability based upon the intermittent nature of Plaintiff's pain symptoms, since the regulatory scheme expressly provides that one may be disabled based upon intermittent symptoms, if established by "a record of ongoing management

14

and evaluation." 20 CFR Pt. 404, Subpt P, App. 1, 1.00D. But the ALJ did not base his non-disability decision prior to April 2011 solely on the fact that Plaintiff's symptoms were intermittent. Rather, he rejected Dr. Saleh's 2006 and 2008 opinions based upon the fact that those opinions were not supported, and contained multiple inconsistencies both internally and with the record as a whole, including Plaintiff's own testimony. He determined that Plaintiff was capable of a limited range of sedentary work during that time period based upon substantial evidence in the record as a whole; his opinion falls within an acceptable "zone of choice."

In a final attack on the ALJ's rejection of Dr. Saleh's 2006 and 2008 opinions, Plaintiff accuses the ALJ of improperly rejecting those opinions solely based upon the conflicting opinions of Dr. Holbrook. *See Gayheart v. Com'r of Soc. Sec.*, 710 F.3d 365 (6th Cir. 2013)(reversing decision where ALJ had rejected treating physician opinion solely based on the conflicting opinions of non-examining consultants). To reiterate, the ALJ did not violate *Gayheart*, but instead rejected the earlier opinions because they were not well-supported, were internally inconsistent, and were inconsistent with the record as a whole.

Despite the ALJ's rejection of Dr. Saleh's 2006 and 2008 opinions, the ALJ gave controlling weight to the 2011 opinion of another treating physician, Dr. Susan Grau. Dr. Grau, a family physician, treated Plaintiff for anxiety, depression, fatigue, and chronic pain for an even longer period than did Dr. Saleh, since February 2000. (Tr. 917). On April 29, 2011, Dr. Grau offered multiple opinions that would preclude all work. (Tr. 917-924). The ALJ cited a number of those opinions to support his conclusion that Plaintiff's overall functional ability had declined over time, to the point that she became disabled on April 29, 2011. (Tr. 26). Dr. Grau opined that a host of

physical conditions, including but not limited to Plaintiff's myoclonic jerking, significantly limits Plaintiff from completing work without interruption or performing at a consistent pace. Ultimately, however, it was not the myoclonic jerking alone, but additional psychological limitations that proved to be the tipping point for the ALJ's disability determination. The ALJ cited the combination of Dr. Grau's opinions on Plaintiff's significant psychological limitations, in addition to her opinions on Plaintiff's physical limitations, as a basis for precluding Plaintiff from all work. (Tr. 917-924). Dr. Grau noted that Plaintiff's inability to focus and concentrate could compromise the safety of her coworkers. (Tr. 26).

Plaintiff's argument that the ALJ should have found her myoclonic jerking to be at a disabling level prior to 2011 is unpersuasive. Dr. Saleh's 2006 and 2008 opinions simply do not support Plaintiff's argument. And a close reading of the ALJ's opinion and the record as a whole makes clear that the ALJ accepted Dr. Saleh's better-supported 2011 opinions only to the extent that they were consistent with other records showing that Plaintiff's total symptoms - particularly psychological symptoms - had "increased" to the point that "she is even more isolative than before" and therefore more restricted in her RFC. (*Id.*).

### 2. Failure to Accept Opinions of Treating Psychologist

As a second assertion of error, Plaintiff argues that the ALJ should have found her to be disabled beginning in 2006 because of the same severe psychological symptoms on which the ALJ based his ultimate decision of disability. Dr. Payne treated Plaintiff for psychological symptoms from 2004 through October 23, 2006. The vast majority of his records pre-date Plaintiff's disability onset date, including an October 7, 2005 opinion that Plaintiff was unable to work based solely on her psychological

impairments. (Tr. 699). Because that opinion pre-dated Plaintiff's alleged disability onset date, it provides no support for Plaintiff's argument that she became psychologically disabled *after* June 22, 2006.

On February 8, 2008, Dr. Payne offered additional opinions, opining that Plaintiff was markedly impaired in her ability to deal with work stress, markedly restricted in daily living activities and social functioning, with "marked to extreme" deficiencies in concentration, persistence or pace. (Tr. 728, 736). Dr. Payne also opined in 2008 that Plaintiff had experienced "three episodes of decompensation" of extended duration. (Tr. 728, 736). An episode of "extended duration" is defined as one lasting for a period of two weeks or more, and generally involves psychiatric hospitalization. In contrast to Dr. Payne, the ALJ found only "one or two episodes of decompensation" rather than three such episodes, (Tr. 21), and Plaintiff does not dispute that finding.

The ALJ discounted the remainder of Dr. Payne's 2008 opinions as "excessive and inconsistent with the record as a whole."

> Dr. Payne has opined that the claimant would have marked restrictions of activities of daily living; marked difficulties in maintaining social functioning, and marked to extreme deficiencies of concentration, persistence, or pace (Exhibit B-29F). The claimant would be expected to have some limitations in her activities of daily living due to her impairments. However, as discussed above, the claimant has stated that she is able to cook, clean, shop, attend appointments, and generally care for her personal needs. As such, any limitations she does have in this area would only be mild in nature. The claimant has difficulties in social functioning. However, her limitations are no more than moderate. While there is some tension, she is living with her husband and daughter. She is able to make it to her doctor, therapy, and chiropractor appointments. She is able to shop and go to church. She visits with family and friends when they come to visit. Her depression and anxiety could make it difficult for her to interact with others. However, Dr. Payne's opinion is not supported by the medical evidence and is being given less weight due to this fact. Dr. Payne has reported that the claimant would have a fair ability to understand, remember and carry out complex job instructions, and an unlimited [to] very good ability to understand, remember and carry out simple job instructions (Exhibit B-29F). This is inconsistent with someone

with marked to extreme deficiencies of concentration, persistence, or pace. Dr. Payne's opinion, as discussed in this paragraph, will be given minimal weight due to the inconsistences and lack of support from the record as a whole.

(Tr. 24-25).

The undersigned has reviewed the entirety of Dr. Payne's records and concurs with the ALJ's assessment that very little evidence exists to support his 2008 opinions. The vast majority of his 2004-2006 records predate Plaintiff's disability onset date, and the largest group of clinical records end in October 2006. Only a handful of extremely cursory progress notes document the period between Plaintiff's disability onset date of June 22, 2006 and Dr. Payne's 2008 opinions, but those records do not support Dr. Payne's extreme opinions concerning Plaintiff's functional limitations. (*See e.g.*, Tr. 872, the lone note dated in 2007, which states: "socialization has improved, irritability is down."). There is no evidence of any diagnostic testing, or other evidence of any criteria used to evaluate Plaintiff's level of functioning, such as GAF scores. Two progress reports from 2009 (after his 2008 opinions) reflect Dr. Payne's advice that Plaintiff "need(s) to get exercise" and that she "needs some activity and less sedentary time." (Tr. 890-891).

As of the date of the hearing, Plaintiff's mental impairments were being treated only with medication, and she was no longer receiving counseling which the ALJ suggested "does not support a disabling mental impairment." (Tr. 25). Plaintiff is correct to point out that she testified that she discontinued psychological treatment with Dr. Payne only after Workers' Compensation would no longer pay for it. An ALJ must consider any stated basis for a failure to attend treatment, *see McKnight v. Sullivan*, 927 F.2d 241, 242 (6th Cir. 1990). Plaintiff also criticizes the ALJ's reliance on a psychological consultant, since the consultant's opinion that Plaintiff was not disabled

was conditioned on Plaintiff's ability to continue in treatment and maintain sobriety.

Having reviewed the record in its entirety, the undersigned finds the ALJ's failure to articulate consideration of Plaintiff's alleged financial inability to continue treatment to be, at most, harmless error. Plaintiff testified at the hearing that she had recently completed paperwork to obtain additional low or no-cost psychological treatment. (Tr. 99). She offers no evidence that she could not have completed that paperwork at an earlier date. More to the point, the ALJ's rejection of Dr. Payne's opinions is supported by substantial evidence.

In addition to being inconsistent with Plaintiff's own testimony and other records, and lacking any support in clinical records, evaluative data, or psychological testing, Plaintiff does not dispute that Dr. Payne's opinions were internally inconsistent. Despite opining that she was "markedly" limited in daily living and social functioning, and "markedly to extremely" limited in concentration, persistence and pace, he simultaneously opined that she retained "fair" abilities to relate to co-workers and interact with supervisors, and to understand, remember, and carry out simple job instructions. (Tr. 836-838). Rather than dispute the many inconsistencies, Plaintiff simply reiterates findings from observations recorded in 2004 and 2005. However, those records are irrelevant to prove a decrease in psychological functioning after the operative onset date of June 22, 2006.

Last, Plaintiff argues briefly that the ALJ over-stated her ability to engage in daily activities without adequately considering her abilities to perform those activities on a sustained basis. In support of this final argument, Plaintiff cites her daughter's testimony that she goes over to her mother's home three days a week to help her, and performs most of the shopping. It is true that the Sixth Circuit has cautioned against viewing a

limited list of daily activities alone as evidence of non-disability, particularly when evaluating mental limitations. *See Gayheart,* 710 F.3d at 377 ("the ALJ does not contend, and the record does not suggest, that Gayheart could do any of these activities on a *sustained basis*, which is how the functional limitations of mental impairments are to be assessed," emphasis original, citing 20 C.F.R. §404.1520a(c)(2), 20 C.F.R. Part 404, Subpt. P, Appx. 1, at 12.00). However, the problem in *Gayheart* was not that the ALJ pointed to daily activities, but instead that the ALJ cited examples "either taken out of context or …offset by other examples in the record," *id.*, at 378, such that substantial evidence did not support his rejection of the treating psychologist's opinions. *See also id.* at 377 ("[t]hese activities would be relevant if they suggested that Gayheart could do something on a sustained basis that is inconsistent with [the psychologist's opinions. But they do not.") Here, the ALJ rejected Dr. Payne's opinions for many reasons besides Plaintiff's daily activities, including their lack of support by any "medical evidence" or detailed clinical data. *Accord Gayheart*, 710 F.3d at 378 (affirming as "well-founded" the ALJ's rejection of another therapist's opinion that relied "on Gayheart's subjective claims rather than on detailed clinical data."). It is worth noting that Plaintiff does not challenge the ALJ's negative assessment of her credibility in this case, which was based partly on the same list of daily activities. (Tr. 23).

The undersigned has discussed the multiple reasons on which this Court can affirm the ALJ's refusal to give controlling weight to Dr. Payne's unsupported disability opinions. In the context of the record as a whole, the undersigned finds no reversible error in the ALJ's citation to Plaintiff's daily activities as among the "other substantial evidence" that undermined those opinions.

### III. Conclusion and Recommendation

The RFC determined by the ALJ in 2012 limited Plaintiff to a restricted range of sedentary work for the period between June 22, 2006 and April 28, 2011. Sedentary work is the lowest exertional level under the regulatory scheme, and further restricting the base of sedentary jobs available indicates a significant level of impairment. In other words, there is no doubt that Plaintiff's multitude of physical and psychological symptoms, including her movement disorder (myoclonic jerking) and severe psychiatric conditions, limit her in very real and substantial ways, and have limited her for many years. The only issue in this appeal is whether Plaintiff has borne her burden to show that her condition worsened to the point of disability the day after her last adverse decision, and up to and including April 29, 2011, rather on or after that date as determined by the ALJ. While the record could support more than one interpretation, the undersigned has concluded that Plaintiff has failed to bear her burden of proving an earlier disability date, and that the ALJ's decision is within a legitimate "zone of choice" and supported by substantial evidence in the record as a whole.

Therefore, **IT IS RECOMMENDED THAT** Defendant's decision be **AFFIRMED** and that this case be **CLOSED**.

  */s Stephanie K. Bowman*
  Stephanie K. Bowman
  United States Magistrate Judge

21

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

LAURA ROGERS-MARTIN,                                    Case No. 1:13-cv-544

              Plaintiff,                                    Beckwith, J.
    v.                                                              Bowman, M.J.

COMMISSIONER OF SOCIAL SECURITY,

              Defendant.

**NOTICE**

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).